(C. D. 1878)

C. J. Tower & Sons et al. *v.* United States

United States Customs Court, Second Division

(Decided May 8, 1957)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Joseph E. Weil* and *Henry J. O'Neill*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Ford, Judge: The suits listed in schedule "A," hereto attached and made a part hereof, were consolidated for trial and disposition. The merchandise covered by said suits was classified by the collector of customs at Buffalo, N. Y., as articles, not specially provided for, composed wholly or in chief value of iron, but not plated with platinum, gold, or silver, or colored with gold lacquer, and duty was levied thereon at the rate of 22½ per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Plaintiffs claim said merchandise to be properly dutiable, that which was entered for consumption prior to June 6, 1951, at the rate of 10 per centum ad valorem under paragraph 312 of said act, as modified, *supra*, and that which was entered for consumption subse-

quent to said date at the rate of 7½ per centum ad valorem under said paragraph 312, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, the pertinent part of which is as follows:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

\* \* \* \* \* \* \*

Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting____ 7½% ad val.

These cases involve a retrial of the question presented and decided in *C. J. Tower & Sons* v. *United States,* 42 C. C. P. A. (Customs) 161, C. A. D. 589. The record in that case has been admitted in evidence as a part of the record herein, and additional evidence was presented by the plaintiffs and the defendant. In the previous case, after reviewing a majority of the decisions of the courts on the question of structural shapes, the Court of Customs and Patent Appeals, in reversing the decision of this court, said:

The evidence in the instant case, we think, established beyond possibility of doubt that the involved elevator sills were manufactured to serve a particular and indispensable function in the operation of elevators. For example, one indispensable structural feature of the sill is the groove through which the hoistway door is held in close line in opening and closing the hoistway doors.

We are unable to conceive of any other art or industry in which the sills, in their imported condition, would be of the slightest use.

They have the particular shape which their particular function requires. Surely, when the common meaning of "structural shapes" is considered, the merchandise meets every possible definition of the phrase, and this court held, in the *Judson Freight Forwarding Company* case, *supra,* that the phrase should be applied on the basis of its common meaning.

For reasons indicated, we feel constrained to disagree with the decision of the trial court.

Therefore, the judgment appealed from is *reversed* and the case is ordered *remanded* for further proceedings not inconsistent with this decision.

The conclusions stated in the above quotation are decisive on the question of what constitutes structural shapes. Since there appears to be no error in said decision, further consideration of the record in the previous case is not required and would not be appropriate here.

We are, therefore, concerned here only with the additional evidence introduced at the trial of the present case. In their brief filed herein, counsel for the plaintiffs correctly summarize the facts established by the additional testimony in substantially the following language:

The witnesses for plaintiff established that an abrasive is added to the iron, but no metallic iron or steel alloy. The purpose of the abrasive is to keep people from slipping. The sills are ordered to contract specifications but are interchangeable for door openings of the same width. They are used for both freight

and passenger elevators. They have no other use but "could" be cut for use as stair treads.

The function of the sill, in addition to supporting the strut, is to bridge the gap between the hoistway wall and the elevator car and to form a cantilever from the floor beam into the hoistway. The struts in turn support the header, while the header supports the door hangers, the doors, and the wall above the door opening.

The sill acts as a continuous beam to support the loads which enter the elevator.

Elevator sills are common or standard articles in elevator construction. They can be cut down to suit particular hoistway doors.

The sills in question are designed to sustain a concentrated load of about three-quarters of a ton at any point or a ton and a half distributed.

They are also designed to get the required strength with the least amount of material.

Cast iron is used because an abrasive can be added in the casting.

From an engineering point of view the term structural shape means any member designed to sustain tension and stresses.

The sills under consideration meet those tests and are widely used in buildings, towers, and ships.

The sill represented by Exhibit 7 is a modified or special shaped structural channel, while the sill depicted in Exhibit 8 is a modified or special shaped structural angle.

An elevator could be installed in an old building, in which case the entire hatchway becomes a structure within a structure.

A sill plate could be removed without destroying or collapsing the building, but not without affecting the angle struts, the door jambs, the door header and the hanger plate despite the fact that the angle struts are secured to the beam of the floor above for bracing purposes; but they rest on the sill.

The removal of a sill plate would create a hazardous condition. It would not be feasible to dispense with the sill plate. The sill is a secondary structural member.

By actual test, an elevator sill of the kind here involved was found to withstand stresses up to 5900 pounds per square inch in the overhanging or cantilever portion. As a beam it was found to withstand stress in tension above 5600 pounds per square inch, and in compression above 14,000 pounds per square inch.

## The defendant offered the testimony of one witness which, in effect, is summarized in plaintiffs' brief as follows:

Sometimes the angle struts are attached to the "I" beam next to the sill plate, and sometimes they rest on the sill. The witness agreed that Exhibit 5 represents about 90 per cent of the installations, and that in Exhibit 5 the sill plate supports the door frame, header, hangers and door.

The witness has removed sill plates without removing the angle struts, the door header, and the hanger plate, but he also testified that:

> The "I" beam supports the "Z" brackets. The "Z" brackets support the sill, and the sill supports the strut iron, and the strut iron supports the headers, and the headers support the hangers, and the hangers support the door.

In the opinion of the witness, the sill plates in question are not structural shapes but castings, because they were cast rather than rolled.

Such sills are used sometimes for elevators which carry heavy objects like safes. He would be willing to run a load of 1000 to 1200 pounds over the sill, Exhibit 7.

He has not heard of an elevator installation since 1923 without the use of sills. Exhibit 7 is ready for use as a sill plate, except for drilling the holes for the strut angles.

Sill plates are standard parts, and though generally made for a particular job, are sometimes interchangeable.

Plaintiffs' two witnesses were exceptionally well qualified in the field of structural shapes. The witness, Mr. Margles, was a graduate engineer, holding a degree of bachelor of science, civil engineer, and later acquired the professional engineer degree when that was required by law. He had had 43 years in the field of structural shapes, working on elevators, furnace hoists, inclined railways, and escalators. The witness, Mr. DeSerio, was a consulting civil and structural engineer, holding a bachelor of science degree in civil engineering from Northeastern University, Boston, Mass. He has written a book on structural planning and design and has been teaching a course on structural planning and design for the Engineering Society of Buffalo for 11 years.

The defendant's single witness, Mr. Granville, was not an engineer, either by training or occupation, but rather an experienced elevator man, and was scarcely qualified to advise the court on the subject of structural shapes. This is singularly demonstrated by his statement that he would not consider the involved sill plate to be a structural shape, because it was cast instead of rolled. Paragraph 312 provides for structural shapes "advanced beyond hammering, rolling, or casting." The quoted words show beyond doubt that the Congress, in enacting said paragraph 312, contemplated structural shapes which had been cast, as well as those which had been rolled.

The defendant relies considerably upon the testimony of its witness to the effect that he had removed sill plates, although very seldom, without removing the angle struts, the door header, and the hanger plate, without the structure collapsing in its effort to establish that these sill plates are not structural shapes. This argument is not convincing when we consider the fact that, in many structures, the beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, and other structural shapes of iron or steel, after long use, become defective and have to be replaced, and that this is done without the structure collapsing.

The above contention of the defendant loses much of its force and effect, when it is considered in connection with the following testimony of one of plaintiffs' witnesses:

The function of the sill, as it applies when we are designing a building, is that it acts as a secondary structural member to carry the load between the elevator and the hoistway and the load which passes over it to our main framing beam, which in turn carries it to the column and the foundation. It is part of an integral system. It is one small part of an integral system which picks up a load in one position, carries it to the main member, and carries it through the basement and foundation. We could at any time remove any small segment of a building and not hurt the structural value of it, because a building is made up of many secondary members, each of which carry a load to a primary member.

When the court questioned plaintiffs' witness DeSerio as to what the difference was between the primary and secondary structural shapes, he answered as follows:

As an example, let's take a house where you have an open basement. You can see the floor joists which span from a wall to a central beam. The floor joists, the individual joists which are spaced 16 inches from the center, are a secondary member. You can remove one of those and the house wouldn't collapse. They in turn are carried by the main longitudinal girder, which carries considerably more load, and if anything were cut out of that girder, you could have a collapse, so that the individual joists are a secondary structural member. They span from the wall to the beam. They hold up the floor, and they are spaced fairly close together, but they are part of the framing system in the house. They are classified as a secondary member.

JUDGE FORD: On the primary structural shapes, can you give us an example of that?

THE WITNESS: The primary structural shape, in a building say of this type that we have here ——

JUDGE FORD: You are referring to the courthouse?

THE WITNESS: Yes. The beams which span along the exterior walls are main structural members. The beams which span along—are buried in the ceiling over this wall, are main structural members. The small beams which span between these two which carry the roof load to it, would be classified as secondary members.

JUDGE FORD: Where do you draw the line?

THE WITNESS: There is no exact line in any one structure. We very often have to set limitations in loading. In columns we set a maximum slenderness ratio, which determines whether it is a primary or secondary member. If the column is very slender, so that it is unstable, then we reduce the loads considerably that we can allow on it, so there wouldn't be a chance of collapse. Those requirements are set up in your State Building Code Commission, State Building Code rules, and also the City of Buffalo rules.

JUDGE FORD: Is there anything beyond the secondary structural shape?

THE WITNESS: We don't carry it any further than that. We carry it either as primary or secondary. We classify everything that isn't a main carrying member, a secondary member. It is complicated enough as it is without getting more classifications in it. That is the basis we use for it.

Paragraph 312, as modified, *supra*, after naming a number of articles *eo nomine*, provides in general terms, without words of limitation, for "* * * all other structural shapes of iron or steel * * *." There is nothing in the words above quoted which suggests that they are to be limited to *primary* structural shapes of iron or steel, to the ex-

clusion of *secondary* structural shapes of iron or steel. A construction of the language employed which would limit its scope to *primary* structural shapes of iron or steel, would, in our opinion, be nothing less than attempted judicial legislation. The rule of law is too well settled to require the citation of authority that, where a dutiable provision names an article without terms of limitation, all forms of the article are thereby included, unless a contrary legislative intent otherwise appears.

In its brief filed herein, counsel for the defendant, referring to the enactment of various provisions for structural shapes, makes the following statement:

* * * The intent of Congress in enacting and reenacting these phrases in the many tariff acts in which they have appeared have been interpreted many times by the courts. However, in approaching the cases, it must always be borne in mind that no precise definition can be laid down to cover these terms, each case depending upon its own record for determination. *Judson Freight Forwarding Co.* v. *United States,* 20 C. C. P. A. (Customs) 229, T. D. 46038; *Otis McAllister & Co.* v. *United States,* 27 C. C. P. A. (Customs) 4, C. A. D. 62; *The Frost Railway Supply Co.* v. *United States,* 39 C. C. P. A. (Customs) 90, C. A. D. 469.

Any departure from the principle laid down in the above-cited authorities, that no precise definition can be laid down to cover structural shape cases and that each case must stand on its own record for determination, would, of course, require a modification or reversal of the above authorities and many others.

Considering the additional testimony offered in this case, which was not in the previous case, we are satisfied that the testimony of plaintiffs' witnesses materially strengthens the plaintiffs' case, while the testimony of the defendant's single witness adds little, if anything, in support of the position of the defendant. Since the evidence in the previous case was considered sufficient to warrant a reversal of this court and to hold the elevator sill plates there in question dutiable as structural shapes, the much stronger evidence in the present case amply warrants a holding that the subject elevator sill plates are structural shapes, within the meaning of said paragraph 312, as modified, *supra.*

Upon a full consideration of all the evidence, for the reasons stated, and following the holding in *C. J. Tower & Sons* v. *United States, supra,* we hold that the plaintiffs have fully sustained their burden of establishing that the collector's classification is wrong and that the claim that the involved merchandise is structural shapes within the meaning of said paragraph 312, as modified, *supra,* is correct.

We, therefore, hold the merchandise covered by the entries made prior to June 6, 1951, to be properly dutiable at the rate of 10 per centum ad valorem under paragraph 312 of the Tariff Act of 1930, as modified by T. D. 51802, and the merchandise covered by the

entries made subsequent to June 6, 1951, we hold to be properly dutiable at the rate of 7½ per centum ad valorem under said paragraph 312, as modified by T. D. 52739, as alleged by the plaintiffs.

To the extent indicated, the specified claims in said suits are sustained; in all other respects and as to all other merchandise, all the claims are overruled.

Judgment will be rendered accordingly.