(C. D. 2054)

JAMES LOUDON & Co., INC.
ARCADIA METAL PRODUCTS, INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 11, 1958)

*Lawrence & Tuttle (Barnes, Richardson & Colburn* by *Joseph Schwartz* and *Eugene L. Girden* of counsel) for the plaintiffs.

*George Cochran Doub,* Assistant Attorney General (*William J. Vitale,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges, LAWRENCE, J., not participating

FORD, Judge: The merchandise, the subject of these protests, consists of cold rolled, mild steel sections of various lengths for use in the installation of sliding glass doors and windows. They were assessed with duty at 1¼ cents per pound or 12½ per centum ad

valorem, depending upon the value, under paragraph 304 of the Tariff Act of 1930, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by 85´ Treas. Dec. 116, T. D. 52462, and by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 403, T. D. 52739, supplemented by 86 Treas. Dec. 265, T. D. 52763, as "steel, not specially provided for."

Plaintiffs claim the merchandise to be properly dutiable at 0.1 cent per pound under paragraph 312 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*, as structural shapes of steel, not assembled, manufactured, or advanced beyond hammering, rolling, or casting. By oral motion, plaintiffs alternatively claim the merchandise to be properly dutiable at 7½ per centum ad valorem under said paragraph, as structural shapes of steel, machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting.

In support of their claims, plaintiffs introduced the testimony of two witnesses. Both of these witnesses were graduate engineers and testified the imported merchandise was a structural shape, designed to carry maximum loads and resist maximum forces with the minimum use of material. The witness who was in charge of designing the sliding doors and windows, with which the imported article is used, testified the principal purpose of the merchandise was for use as a track. Both witnesses believed the imported merchandise to be a structural shape since it carried wind loads and also supported the traffic passing in and out of the doors.

The interpretation of the term, "structural shapes," has been before the courts many times since this term was first employed. However, no precise definition has been laid down to cover this term, each case to be determined in the light of its own record. *The Frost Railway Supply Co.* v. *United States,* 39 C. C. P. A. (Customs) 90, C. A. D. 469, and cases cited therein. We do not deem it necessary to review the cases on structural shapes, since former Chief Judge Garrett, in the case of *United States* v. *The Winkler-Koch Engineering Co.,* 41 C. C. P. A. (Customs) 121, C. A. D. 540, summarized the basic decisions of the appellate court involving structural shapes.

Plaintiffs rely mainly upon the decision in the case of *C. J. Tower & Sons* v. *United States,* 42 C. C. P. A. (Customs) 161, C. A. D. 589, which held the elevator sill plates involved therein to be designed and actually used in their imported condition as structural shapes. The evidence adduced therein also established that, in addition to their structural function, they also guided the hoistway door of the elevator.

However, the record in the case at bar establishes without contradiction that the primary purpose of the imported merchandise is to

serve as a track. In the *Tower* case, *supra*, the following testimony is set forth which, in the opinion of the appellate court, brought the elevator sill plates involved therein within the purview of paragraph 312 of the Tariff Act of 1930:

\* \* \* A sill plate is a part of a hoistway door assembly used at the entrance-way to an elevator at each landing. It's a cast iron plate properly designed with grooves to guide the sliding hoistway doors, the bottom of the sliding hoistway doors. And it's fastened to the building structural steel and supports the struts and the buck and the header, the door hangers and the doors, which go to make up this assembly.

He further testified:

\* \* \* [T]he sill is used to support the door frame to guide the doors and it's very carefully set in relation to the elevator guide rails for alignment with the elevator because the door frame and the sill support door closers or operating devices or power operators and interlocks \* \* \* are frequently operated from apparatus or devices carried by the elevator car. So that in order to assure alignment between the sill and the door frame and these devices the sill and door frame are set in proper relation to the guide rails.

Q. And what function is performed by the grooves in the sill plate? A. Well, the hoistway doors are sliding doors, moving horizontally, and they are equipped with small guide blocks which project down below the bottom of the door into the groove in this sill plate so that the groove guides the bottom edge of the door.

In the instant case, Charles B. LeBon, a witness called on behalf of plaintiffs, described the function of the imported article as follows:

R. Q. What other functions do they have?—A. As I have indicated, the sill member has to support the weight of the glass in the stationary panel as well as to support any traffic that passes in and out of the door. The header member, which is made up of 2501 and 2, serves to carry wind loads that are imposed on the outside, and in addition it has to support the glass or any other material that is used in the transom over the door.

Joseph Sheffet, also called on behalf of plaintiffs, described the imported merchandise as follows:

A. The sill piece is used for the structural purpose of delivering the load imposed upon it, whether it be a traffic load or the weight of the door or fixed sash, and it delivers a load to the two upright portions of that sill, since the grounding underneath is not reliable as a load-carrying element. Section 2501 and 2502 form a door head, they carry loads delivered largely by wind by [*sic*], normal to the surface of the door and to the surface of the transom over the door.

Based upon the record in the instant case, it is evident that the involved merchandise was primarily designed and actually serves as a track upon which the sliding door rests. In the *Tower* case, *supra*, the elevator sill plate involved therein primarily was designed for use as a threshold which also guided the elevator door by use of a guide block that was inserted into the guide groove. The functions of the track involved herein and the sill plate involved in the *Tower* case, *supra*, are, therefore, quite different. The evidence does not satisfactorily establish that the imported merchandise carries any load

other than the wind load imposed on the glass, the weight of the glass, and that of the traffic through the door.

In *C. J. Tower & Sons et al.* v. *United States*, 38 Cust. Ct. 300, C. D. 1878, this court had before it a retrial of the original *Tower* case, *supra*, involving elevator sill plates. Additional testimony was adduced at the retrial of the issue which established that structural shapes may be primary or secondary members. Witness DeSerio, in the *Tower* case, C. D. 1878, *supra*, testified with respect to this matter as follows:

As an example, let's take a house where you have an open basement. You can see the floor joists which span from a wall to a central beam. The floor joists, the individual joists which are spaced 16 inches from the center, are a secondary member. You can remove one of those and the house wouldn't collapse. They in turn are carried by the main longitudinal girder, which carries considerably more load, and if anything were cut out of that girder, you could have a collapse, so that the individual joists are a secondary structural member. They span from the wall to the beam. They hold up the floor, and they are spaced fairly close together, but they are part of the framing system in the house. They are classified as a secondary member.

JUDGE FORD: On the primary structural shapes, can you give us an example of that?

THE WITNESS: The primary structural shape, in a building say of this type that we have here——

JUDGE FORD: You are referring to the courthouse?

THE WITNESS: Yes. The beams which span along the exterior walls are main structural members. The beams which span along—are buried in the ceiling over this wall, are main structural members. The small beams which span between these two which carry the roof load to it, would be classified as secondary members.

From the foregoing, it is evident that there are in fact primary and secondary structural shapes. The latter, in turn, carry a building load to a primary structural shape which is the member actually carrying the load.

In the instant case, the sill plate, item 2500, is not attached to or connected with any primary or secondary structural member of the building, but is in fact merely grouted or cemented into the floor. The other sections, 2501 and 2502, appear to sustain the weight of the glass and the wind imposed upon it in the same manner as the sash of a window.

Apropos of this, are the various comparable examples of articles employing tracks that are used in modern-day construction, i. e., sliding glass windows, sliding glass bathtub enclosures, and sliding closet doors. All of these articles employ the use of a strip of metal which serves as a track. The sliding glass window track would appear to sustain the weight of the glass and the wind imposed upon it, and the bathtub enclosure would sustain the weight of the glass as well

as the weight of a person stepping into the bathtub, while the track used in a closet would sustain the weight of a person stepping upon it as well as the weight of the door. We would, however, hesitate to hold such articles to be structural shapes solely by reason of the fact that their primary function is to serve as a track, as is admitted in the instant case, and only incidentally sustain weight.

In the case of *Otis McAllister & Co. v. United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52, the court held certain corrugated iron sheets used to form walls and roofs not to be structural shapes, within the purview of paragraph 312 of the Tariff Act of 1930, based in part upon the following reasoning:

> Of course there can be no question but that a roof covering which is always fastened to beams of some character and the sidings which are likewise attached to the upright studding must, of necessity, lend strength, in some degree, to the structure in which they are placed.

> It is also true that in constructing buildings the roof must have a load carrying capacity and likewise that the sides must be able to withstand the stress of wind and weather. We are convinced, however, that as to load carrying and wind resistance the elements of the building designed to function in these respects is not the coverings but the framework. The record does not disclose that the sheets of themselves are designed to carry a building load or stress. That the corrugated sheets are stronger than flat sheets of the same material is a physical fact. That they help to form a strong, long wearing siding and roof when fastened to the frame is self-evident. That they are designed for use as load carrying members in the building are, however, is not the fact. The sheets comprising the roof and sides of a building are really carried by the frame of the building. A strong wind would quickly flatten a siding of the imported material if it were not adequately supported by a framework and a roof of the sheets would collapse under a weight if the sheets were not sufficiently supported by the underlying joists. We are convinced that any strength that may be incorporated in a structure by the use of the imported merchandise is at best incidental.

In the case at bar, although both witnesses describe the imported merchandise as structural shapes and testify that it carries wind loads and the weight of the glass as well as the weight of the people or automobiles passing through the sliding door, it is also admitted that the bottom track is merely grouted or cemented in the foundation and is not necessarily connected to any structural member of the building. The court, in the *Otis McAllister* case, *supra*, was aware of the fact that the corrugated sheets involved therein actually did resist or carry wind loads and snow loads, but the court stated therein that, without the frame of the building, the structure would quickly flatten. The court, therefore, concluded that any strength incorporated in the structure by use of the imported merchandise was incidental.

By the same token, in the instant case, it is admitted the primary function of the involved merchandise is that of a track and, as such, any load carried by said merchandise, such as the wind load imposed on the glass, the weight of articles passing over it, and the weight of the

glass in the door or transom, would only be incidental. The mere fact that the merchandise supports the wind loads imposed on the glass or the weight of the glass in the transom does not *ipso facto* establish that the involved steel sections are structural shapes within the purview of paragraph 312 of the Tariff Act of 1930, as modified, *supra*.

Upon a full consideration of all the facts and for the reasons stated, we hold that the merchandise covered by the protests herein is properly dutiable at 1¼ cents per pound or 12½ per centum ad valorem under paragraph 304 of the Tariff Act of 1930, as modified, *supra*, depending upon the value, as classified by the collector of customs. Judgment will be rendered accordingly.